UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| MICHELLE CHARVAT, | CASE NO. 1:22-CV-02121-BYP |
| Plaintiff, | JUDGE BENITA Y. PEARSON |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

INTRODUCTION

Plaintiff Michelle Charvat challenges the Commissioner of Social Security's decision denying disability insurance benefits ("DIB"). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On November 22, 2022, pursuant to Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry dated Nov. 22, 2022). Following review, and for the reasons stated below, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** for additional proceedings consistent with this recommendation.

PROCEDURAL BACKGROUND

Ms. Charvat initially filed an application for DIB in September 2017 alleging a disability onset date of December 20, 2015. (Tr. 98). On May 3, 2019, an ALJ found Ms. Charvat not disabled and on August 17, 2021, this Court affirmed that decision. (Tr. 98-116).

1

Ms. Charvat completed her current application for DIB on October 19, 2020, alleging a new disability onset date of May 4, 2019. (Tr. 237-38). The claim was denied initially and on reconsideration. (Tr. 119-26, 128-37). She then requested a hearing before an Administrative Law Judge. (Tr. 151-52). Ms. Charvat (represented by counsel) and a vocational expert ("VE") testified before the ALJ on September 16, 2021. (Tr. 35-72). On November 3, 2021, the ALJ issued a written decision finding Ms. Charvat not disabled. (Tr. 12-34). The Appeals Council denied Ms. Charvat's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6; *see* 20 C.F.R. §§ 404.955, 404.981). Ms. Charvat timely filed this action on November 22, 2022. (ECF #1).

## FACTUAL BACKGROUND

### I.  PERSONAL AND VOCATIONAL EVIDENCE

Ms. Charvat was 31 years old on the alleged onset date, and 33 years old at the administrative hearing. (Tr. 43, 119). Ms. Charvat obtained a bachelor's degree. (Tr. 44). In the past, Ms. Charvat has worked as a bank teller, a mortgage clerk, and an abstractor. (Tr. 48-49).

### II.  RELEVANT MEDICAL EVIDENCE

The district court decision affirming the prior ALJ's decision denying benefits reveals a medical history significant for surgical decompression of a Chiari malformation in May 2015, from which she "recovered nicely."[1] *Charvat v. Comm'r of Soc. Sec.*, No. 1:20-cv-1608, 2021 WL 3633478,

---

[1]        Chiari malformation is a condition in which brain tissue extends into the spinal canal. It occurs when a part of the skull is misshapen or smaller than is typical, pressing on the brain and forcing it downwards, displacing the lower part of the cerebellum of the brain into the spinal canal. Headaches, often severe, are the classic symptom of Chiari malformation, but other symptoms can include neck pain, unsteady gait, poor hand coordination, numbness and tingling in the hands and feet, dizziness, and difficulty swallowing. Mayo Clinic, *Chiari malformation,*

at *2 (N.D. Ohio Aug. 17, 2021). In February 2016, Ms. Charvat reported the surgery had eliminated the feelings of shock and tingling in her chest and body, but she still had pain, balance problems, and visual changes. *Id.* at *3. In April 2016, Ms. Charvat's continued headaches and neck pain remained significant enough to begin receiving Botox injections. *Id.* She reported 50% relief from headaches with the injections, but continued to have jaw fatigue, panic attacks, chest pain, neck and shoulder tightness, fatigue, and dizziness. *Id.* Medical records also show Ms. Charvat suffered an aortic dissection at age 14 after she was rear-ended by a semi-truck and underwent ascending aortic aneurysm repair and later had extensive jaw surgery resulting in replacement of the mandible and chin with metal parts. (Tr. 404).

On September 17, 2018, Ms. Charvat complained of nerve pain and indicated she was not tolerating Lyrica well. (Tr. 403). She was diagnosed with central pain syndrome and instructed to discontinue Lyrica and begin taking Topamax. (Tr. 405). On September 19, 2018, Ms. Charvat received more Botox injections. (Tr. 402-03). On October 17, 2018, Ms. Charvat reported that Topamax made her tired at first, but then it felt as though a flip switched and she felt better, though she continued to need injections for migraines. (Tr. 399). She received another round of Botox injections on December 19, 2018. (Tr. 396). At the office visit, she described gradually worsening neck and shoulder pain that causes migraines, aggravated by smell, noise, and light. (Tr.

---

http://www.mayoclinic.org/diseases-conditions/chiari-malformation/symptoms-causes/syc-20354010 (last accessed October 16, 2023). Symptomatic Chiari malformations are usually treated with surgery, where a small section of bone in the back of the skull is removed to relieve some pressure. The surgery "helps reduce symptoms in most people, but if nerve injury in the spinal canal has already occurred, this procedure won't reverse the damage." Mayo Clinic, *Chiari malformation*, http://www.mayoclinic.org/diseases-conditions/chiari-malformation/diagnosis-treatment/drc-20354015 (last accessed October 16, 2023). (Tr.

394). Ms. Charvat also noted the last round of Botox injections offered 90% improvement in pain for three months. (*Id.*).

On March 17, 2019, Ms. Charvat met with her primary care physician, Kornelia Solymos, M.D., to receive an updated referral to pain management. (Tr. 382-86). She described her neck and head pain as "improved" since she began seeing pain management for injections. (Tr. 382). She reported taking indomethacin (NSAID) for migraines, Topamax for nerve pain in her arms, and a muscle relaxer for pain. (*Id.*). She also reported taking Imitrex two to three times a week to shorten the duration of her migraines, but the medicine had stopped helping as much. (*Id.*).

On March 21, 2019, Ms. Charvat met with Matthew Grujich, M.D., for pain management and endorsed not currently having migraine pain. (Tr. 379). She reported the Botox injections in December 2018 resulted in a 50% decrease in migraine frequency but did not decrease or alleviate the intensity of the migraines. (*Id.*). While in the office, Brendan Astley, M.D., provided another round of Botox injections and added an injection under the angle of each jaw to help relieve Ms. Charvat's reported jaw and migraine pain. (Tr. 380). She received more Botox injections on July 23, November 5, and December 20, 2019, and May 5, 2020. (Tr. 327, 368, 351-52, 357-58).

On May 19, 2020, Ms. Charvat attended a telehealth visit with neurologist John Collins, M.D., where she described chronic headaches with chronic neck pain and central pain syndrome. (Tr. 321-22). She reported her decompression surgery did not help at all with the headaches. (Tr. 322). Dr. Collins determined Ms. Charvat's chronic, intractable headaches are multifactorial, with "tension and migraine elements with note of chronic muscle spasms and cervicalgia that is contributing along with her Chiari Malformation." (Tr. 325). The doctor also noted Ms. Charvat's adverse gastrointestinal side effects with confusion and paresthesia with any dose of Topamax

4

above 50 mg daily. (*Id*.). Dr. Collins prescribed 20 mg amitriptyline "since [she is] unable to proceed with Topamax titration for her headache," referred her to physical therapy for neck exercises to increase range of motion, and muscle relaxant therapy "given [history of] neck surgery and neck pain with likely cervical muscle spasms." (*Id*.).

On September 1, 2020, Ms. Charvat had a telehealth appointment with Dr. Solymos to address chronic headaches with chronic neck pain and central pain syndrome. (Tr. 317-21). Ms. Charvat reported taking Imitrex a few times each week, which helps to break up headaches after a few hours. (Tr. 318). She also reported Cymbalta was helpful for her panic, but she stopped taking it because she noticed it made her angry. (*Id*.). After discontinuing the medication, Ms. Charvat reported having so many panic attacks that she stopped driving and could not go to the store. (*Id*.). Dr. Solymos prescribed Prozac. (Tr. 320).

On September 29, 2020, Ms. Charvat had a telehealth appointment with Dr. Solymos to address complaints of anxiety, depression, and panic disorder. (Tr. 315-17). She endorsed taking half of the prescribed dosage of Prozac, preferring to start slow, and denied any side effects. (Tr. 315). Ms. Charvat explained that, before Prozac, she was unable to go outside to walking on her own without panic. (*Id*.). She reported driving only short distances because she is scared to drive. (*Id*.). Ms. Charvat stopped taking amitriptyline, claiming to not need it for sleep. (*Id*.). Dr. Solymos increased Prozac to 20 mg and ordered her to restart amitriptyline "as it contributes to migraine prevention." (Tr. 317).

On January 15, 2021, Ms. Charvat had a telehealth appointment with Dr. Solymos and complained of worsened pain but noted that diazepam helps for sleep. (Tr. 824-28).

On January 19, 2021, Ms. Charvat attended an office visit with Jills S. Vidrine, PA-C, of the Advanced Spine Joint and Wellness Center (ASJWC) and complained of chronic full spine pain and pain in the legs that worsened in October and November of 2020. (Tr. 699). She described constant discomfort including aching joints, stabbing, knotting, and tightness in the back, with pain radiating into both legs to the ankles and feet, and headaches. (*Id.*). Ms. Charvat also complained of bilateral shoulder pain, described as aching, sharp, and radiating to the biceps. (*Id.*). She explained that almost any movement aggravates both conditions and has difficulty with many daily activities after just twenty minutes of movement, including lifting, washing, dressing, bathing, homemaking, sleeping, sitting, standing, traveling and driving, and walking. (*Id.*).

Provocative orthopedic testing revealed pain with shoulder depression on the left at C4-C5, C5-C6, and C6-C7; Kemp's Test on the right at L4, L5, and the right sacrum; Nachlas' Test on the right sacroiliac joint to the thigh; Patrick's Test at the right hip joint; and a straight leg raiser test with pain on the right sacroiliac joint at 40 degrees. (Tr. 700). Neurological testing revealed normal strength, reflexes, and sensation. (Tr. 700-01). Musculoskeletal testing revealed tenderness on palpation to the cervical, thoracic, and lumbar spine; sacroiliac joints; and bilateral posterior hips, buttocks and thighs. (Tr. 701). PA Vidrine also noted the presence of muscle spasms and a pelvic deficiency based on a high left shoulder and a short right leg. (*Id.*). She diagnosed Ms. Charvat with disc degeneration and disc disorder with radiculopathy at C5-C6 and C6-C7, cervical pain and sprain of ligaments, lumbar radiculopathy, bilateral sciatic, lumbosacral radiculopathy and disc degeneration, lumbar and lumbosacral enthesopathy, and muscle spasms in the back. PA Vidrine ordered spinal X-rays, trigger point injections, a TENs unit, a rigid lumbosacral support brace, and physical therapy. (Tr. 702). Cervical spine X-rays revealed a loss of kyphotic cervical curve,

6

narrowed disc space between C6 and C7, and osteophytic changes at C6. (Tr. 703). Thoracic spine X-rays showed mild levoscoliosis. (*Id.*). Lumbar X-rays were significant for mildly narrowed disc space between L5-S1 and an internally rotated right ilium. (*Id.*). Otherwise, the X-rays revealed surgical plates at the occiput and the mandible. (*Id.*).

On January 22, 2021, Ms. Charvat met with chiropractor Matthew Meehan, D.C., also of ASJWC. (Tr. 707-11). Range of motion testing in the cervical and lumbosacral spine revealed all-over stiffness and decreased range of motion; Ms. Charvat had additional pain with left and right lateral flexion of the cervical spine, and with extension and left and right lateral flexion of the lumbosacral spine. (Tr. 708). Dr. Meehan noted tenderness in the cervical, thoracic, and lumbar spine, trapezius areas, and at the right and left ankle. (*Id.*). He also noted a pelvic deficiency and restrictions at C4, C6, T2, T5, T9, T11, L2, L4 and L5. (*Id.*). Hypertonicity, muscle spasms, and tautness were identified along the cervical, thoracic, lumbar, and sacral segments of the spine. (Tr. 708-09). Dr. Meehan diagnosed lumbar and lumbosacral radiculopathy, bilateral piriformis syndrome, enthesopathy in the thoracolumbar, lumbar, and lumbosacral areas, muscle spasm in the back, cervicocranial syndrome, and cervicobrachial syndrome. (Tr. 710). Dr. Meehan performed chiropractic manipulative treatment. (Tr. 711).

Ms. Charvat returned to ASJWC on January 25, 2021, for treatment and complained of continued tightness and discomfort in the back of the neck. (Tr. 705). On examination, PA Vidrine found trigger points or taut muscle bands at the left and right levator scapula muscles, a twitch response, referred pain, and referred tenderness. (*Id.*). Ms. Charvat received trigger point injections during the office visit. (Tr. 706). That day, Ms. Charvat also met with Dr. Meehan with the same complaints as her first chiropractic appointment. (Tr. 712). He found moderate to severe

tenderness on palpation of the cervical, thoracic, and lumbar spine segments; restricted range of

motion in the cervical and lumbar spine; and hypertonicity, tautness, and muscle spasms. (Tr. 712-

13). Dr. Meehan performed chiropractic manipulative treatment. (Tr. 713).

Ms. Charvat also attended a physical therapy evaluation on January 25, 2021. (Tr. 872-76).

As part of the evaluation, Ms. Charvat completed a Neck Disability Index questionnaire and

endorsed the following:

- The pain is very severe at the moment.
- I do not get dressed. I wash with difficulty and stay in bed.
- I can lift only very light weights.
- I can't do any work at all.
- I have headaches almost all the time.
- I have a great deal of difficulty concentrating.
- My sleep is greatly disturbed for up to 3-5 hours.
- I can hardly drive at all because of severe neck pain.
- I can't read as much as I want because of severe neck pain.
- I can't do any recreational activities due to neck pain.

(Tr. 872).

She complained of continuous tightness in the back of her neck and described constant

neck pain radiating into her hands and constant low back pain radiating into her feet, worsened by

sitting, turning, standing, and reaching. (Tr. 873). Ms. Charvat tolerated the physical therapy

treatment. (Tr. 875). She returned on January 28, 2021, for additional therapy and described the

same discomfort in her upper back and indicated it occurred about 90% of the time. (Tr. 877).

She performed therapeutic exercises and activities and received manual traction. (*Id.*).

On January 28, 2021, Ms. Charvat sought chiropractic treatment where she reported

similar complaints and displayed the same tenderness, range of motion, and hypertonicity issues as

at her previous appointment. (Tr. 715-16). Dr. Meehan performed chiropractic manipulative

treatment. (Tr. 716). Complaints, findings, and treatment were similar on February 1, 2021. (Tr. 718-20).

On February 2, 2021, Ms. Charvat attended another physical therapy session and complained of the same discomfort but noted the pain only occurred 80% of the time. (Tr. 879). Ms. Charvat tolerated the treatment well and did not report adverse effects. (*Id.*). She returned on February 4, complaining of continuous aching and tightness in the back of the neck occurring constantly. (Tr. 881). Ms. Charvat performed therapeutic exercises and activities and received manual traction. (*Id.*) That same day, Ms. Charvat also sought chiropractic treatment with Dr. Meehan. (Tr. 945). There, she complained of continuous aching and tightness in the back of the neck occurring constantly. (*Id.*). Dr. Meehan noted moderate to severe tenderness in the cervical, thoracic, and lumbar spine; moderately restricted range of motion in the cervical and lumbar spine; and hypertonicity, tautness, and muscle spasm along the cervical, lumbar, and sacral spine. (Tr. 946).

On February 5, 2021, Ms. Charvat attended a telehealth visit with Dr. Solymos and reported feeling better but noted continued pain in her ankles and feet. (Tr. 829). Ms. Charvat also reported that she "feels that she can get things done" while taking 40 mg of baclofen. (*Id.*). Dr. Solymos encouraged regular use of amitriptyline at night and prescribed an increased dose of Prozac. (*Id.*).

On February 9, 2021, Ms. Charvat returned to ASJWC and received lumbar trigger point injections after PA Vidrine located painful trigger points and taut muscle bands in the left and right sacroiliac joint muscles. (Tr. 842-43). That day, she sought chiropractic treatment for continuous tightness and discomfort in the upper back. (Tr. 948). Dr. Meehan found similar

9

tenderness, restricted range of motion, hypertonicity, and muscle spasm as on February 4. (Tr. 948-49). Ms. Charvat also attended a physical therapy session, where she described her upper back discomfort as occurring 90% of the time. (Tr. 883). She tolerated treatment well and did not report adverse effects. (*Id.*). At her next physical therapy session on February 11, Ms. Charvat complained of additional left ankle pain occurring 100% of the time. (Tr. 885).

On February 11, 2021, Ms. Charvat also sought chiropractic care and complained of discomfort in the back of the left ankle occurring continuously. (Tr. 951). Dr. Meehan noted moderate to severe tenderness in the cervical, thoracic, and lumbar spine; moderately restricted range of motion in the cervical and lumbar spine; and hypertonicity, tautness, and muscle spasm along the cervical, lumbar, and sacral spine. (Tr. 951-52). She tolerated chiropractic manipulative treatment well. (Tr. 957).

On February 18, 2021, Ms. Charvat sought chiropractic treatment and complained of continuous tightness and sharp, aching discomfort in the right trapezius occurring 80% of the time. (Tr. 958). Chiropractic manipulative treatment revealed spasm, hypomobility, and end-point tenderness in the cervical, thoracic, lumbar, and pelvic regions. (Tr. 959). That same day, at physical therapy, Ms. Charvat complained of continuous tightness and sharp, aching discomfort in the right trapezius occurring approximately 80% of the time. (Tr. 888).

On February 22, 2021, Ms. Charvat attended another physical therapy session and reported continuous tightness and sharp, aching discomfort in the right trapezius occurring 100% of the time. (Tr. 890). That day, she made similar complaints to Dr. Meehan during chiropractic treatment. (Tr. 962).

10

At her next physical therapy session on February 25, 2021, Ms. Charvat complained of a headache occurring 90% of the time. (Tr. 893). She tolerated treatment well and did not report adverse effects. (*Id.*). Ms. Charvat also attended a chiropractic treatment session and complained of a headache. (Tr. 964). On examination, Dr. Meehan found moderate to severe tenderness in the cervical, thoracic, and lumbar spine; moderately restricted range of motion in the cervical and lumbar spine; and hypertonicity, tautness, and muscle spasm along the cervical, lumbar, and sacral spine. (Tr. 964-65). Ms. Charvat tolerated treatment well and reported no adverse effects. (Tr. 965).

On March 1, 2021, Ms. Charvat attended a physical therapy session and complained of both a headache, occurring 100% of the time, and continuous tightness and discomfort in the left trapezius, occurring 90% of the time. (Tr. 895). She made the same complaints to Dr. Meehan during her chiropractic treatment session. (Tr. 967).

On March 4, she returned to physical therapy and complained of continuous aching, burning tightness and sharp discomfort in the back of the neck, occurring constantly. (Tr. 897). That day, she made the same complaints during her chiropractic treatment session with Dr. Meehan. (Tr. 970). She endorsed similar symptoms during her next physical therapy  and chiropractic treatment sessions on March 8, 2021. (Tr. 899, 973).

On March 11, 2021, Ms. Charvat told her physical therapist of a continuous throbbing and aching headache, occurring 90% of the time. (Tr. 901). She described the same symptoms to Dr. Meehan during her chiropractic treatment session that day. (Tr. 976). Chiropractic manipulative treatment continued to show spasm, hypomobility, and end-point tenderness in the cervical, thoracic, lumbar, and pelvic regions. (Tr. 977).

11

On March 15, 2021, Ms. Charvat met with PA Vidrine and complained of continued neck and low back pain. (Tr. 850-52). She reported that chiropractic adjustments and medications helped relieve her neck pain and that chiropractic care, medications, and massage helped relieve her low back pain, but her pain continued to be aggravated by almost any movement. (Tr. 850). All provocative orthopedic testing was negative. (*Id.*). Ms. Charvat also had normal muscle strength, reflexes, and sensation. (Tr. 850-51). She continued to have tenderness to palpation along the full spine, trapezius muscles, hips, and buttocks as well as muscle spasms. (Tr. 851). Ms. Charvat reported 50% improvement since the start of her care. (Tr. 852). Ms. Charvat also attended a physical therapy session that day and described continuous tightness in the upper chest occurring approximately 60% of the time. (Tr. 887).

That same day, during a chiropractic appointment with Dr. Meehan, Ms. Charvat reported her neck pain stayed the same, but her low back pain improved slightly. (Tr. 979). Dr. Meehan performed chiropractic manipulation that Ms. Charvat tolerated well. (Tr. 981-82).

On March 16, 2021, Ms. Charvat attended a pain management appointment and endorsed a gradually worsening course of head pain with light and sound sensitivity and daily headaches that do not cease until she goes to sleep for the night. (Tr. 801). Once she has a headache, she cannot complete her activities of daily living. (*Id.*). The cold increases her neck pain and causes the pain to travel to her forehead; the pain lasts for hours each day. (*Id.*). She received six trigger point injections around the posterior superior iliac spine and trapezius muscles. (Tr. 805). The treating provider noted that Botox injections had worked very well for Ms. Charvat in the past and ordered her to return to the clinic for additional injections when the treatment was approved by insurance. (*Id.*).

12

On March 18, 2021, Ms. Charvat attended a physical therapy session and complained of continuous sharp, aching, throbbing, and shooting discomfort in the back of the neck occurring constantly. (Tr. 903). She also attended chiropractic treatment where she made the same complaint. (Tr. 983).

On March 21, 2021, at a physical therapy session, Ms. Charvat completed another Neck Disability Index Questionnaire where she endorsed all the same statements with the exception that she gets dressed every day but needs help with most aspects of self-care. (Tr. 907). On March 22, 2021, Ms. Charvat complained of similar discomfort in the back of the neck occurring constantly. (Tr. 905).

Ms. Charvat also attended a chiropractic treatment session on March 22 and complained of continuous sharp, shooting, and aching tightness and discomfort in the back of the neck occurring constantly. (Tr. 986). Dr. Meehan noted moderate to severe tenderness in the cervical, thoracic, and lumbar spine; moderately restricted range of motion in the cervical and lumbar spine; and hypertonicity, tautness, and muscle spasm along the cervical, lumbar, and sacral spine. (Tr. 986-87). Dr. Meehan noted Ms. Charvat's overall condition was "progressing slow, but steady." (*Id.*).

On March 25, 2021, PA Vidrine found taut muscle bands and palpable knots of muscle that caused pain with compression, referred pain and tenderness, restricted stretch range of motion, and motor dysfunction. (Tr. 853). Ms. Charvat received trigger point injections at the left and right suboccipital areas. (*Id.*). That day, Ms. Charvat also attended a physical therapy session and complained of continuous aching, tightness, and shooting discomfort in the low back occurring 90% of the time. (Tr. 909). She made the same complaint to Dr. Meehan during her

13

chiropractic appointment that day. (Tr. 989). At her next physical therapy and chiropractic treatment sessions on March 29, Ms. Charvat complained of continuous aching and tightness in the back of the neck occurring 90% of the time. (Tr. 911, 992). On April 1, 2021, Ms. Charvat attended another physical therapy session and described similar symptoms occurring constantly. (Tr. 913).

On April 4, 2021, Ms. Charvat returned to ASJWC and reported improvement in the frequency and intensity of pain from the last procedure. (Tr. 855). On examination, PA Vidrine found "small, abnormally sensitive areas in muscle that are confined to a limited space," and noted Ms. Charvat experiences referred pain to the same region. (*Id.*). Ms. Charvat received injections to the left levator scapula and the right splenius capitus. (*Id.*). PA Vidrine noted Ms. Charvat seems to have chronic "overload" of the muscles in that region and the identified trigger points (palpable cords) produce a referred pain pattern to the neighboring muscle groups. (*Id.*). PA Vidrine also noted focal tenderness and referred pain upon pressure of the trigger point and decreased range of motion in the area. (*Id.*).

On April 5 and 8, 2021, Ms. Charvat endorsed continuous tightness and aching discomfort in the back of the neck occurring constantly. (Tr. 915-16).

On April 12, 2021, Ms. Charvat saw PA Vidrine again with continued neck pain radiating into the bilateral shoulders and low back, hip, ankle, and feet pain bilaterally. (Tr. 857). She reported no improvement in her neck pain but some improvement in low back and lower extremity pain. (*Id.*). Ms. Charvat noticed more flareups in back pain after she stopped receiving chiropractic adjustments and expressed interest in further chiropractic care. (*Id.*). Overall, Ms. Charvat report 60% improvement since the start of care. (Tr. 859). Soto-Hall testing produced

upper cervical spine and cervico-thoracic spine pain without radiation, greater on the left side. (Tr. 857). Ms. Charvat continued to have musculoskeletal tenderness and muscle tone changes; additionally, PA Vidrine found active trigger points at the right quadratus lumborum and the bilateral levator scapulae and upper trapezius muscles. (Tr. 858). During a chiropractic appointment that day, Ms. Charvat complained of continued and constant neck pain but noted improvement in her low back pain. (Tr. 995). On examination, Ms. Charvat displayed some restricted range of motion in the cervical and thoracolumbar spine with improvement from prior findings; mild to moderate tenderness to palpation of the cervical, thoracic, and lumbar spine; and hypertonicity and tautness along the cervical, thoracic, and lumbar spine. That same day, Ms. Charvat attended a physical therapy session and complained of continuous tightness, throbbing, aching, and sharp discomfort in the back of her neck occurring constantly. (Tr. 918). She made a similar complaint on April 15, 2021. (Tr. 919).

On April 26, 2021, Ms. Charvat returned to ASJWC for additional trigger point injections and complained of shooting, aching, burning, and tightness discomfort in her buttocks. (Tr. 860). Troy Naftzger, PA-C found taut muscle bands or palpable knots of muscle, referred pain and tenderness, and restricted stretch range of motion. (*Id.*). Ms. Charvat received trigger point injections in the bilateral gluteal muscles. (*Id.*). Ms. Charvat also attended a physical therapy session where she described continuous shooting, aching, burning, and tightness discomfort in the buttocks occurring constantly. (Tr. 923). At her next physical therapy session on April 29, Ms. Charvat complained of worsened tightness and aching in the back of her neck occurring constantly. (Tr. 925).

On May 3, 2021, at physical therapy, Ms. Charvat complained of the same pain occurring constantly, but reported that her symptoms were better since her last visit. (Tr. 927). At a chiropractic treatment session that day, she complained of tightness in the posterior cervical spine and "on and off" tightness in the lumbar spine. (Tr. 1001). On examination, Ms. Charvat had restricted cervical range of motion without pain, stiffness, or radiation but no restriction or pain on thoracolumbar range of motion testing. (Tr. 999). The chiropractor changed Ms. Charvat's diagnosis to reflect segmental/somatic dysfunction in the cervical, thoracic, and lumbar regions, cervicalgia, pain in the thoracic spine, and stabilized low back pain. (Tr. 1001). He determined Ms. Charvat had reached maximum medical improvement for her conditions and recommended chiropractic care two times a month for the next six months. (*Id.*).

On May 10, 2021, Ms. Charvat returned to ASJWC for additional lumbar trigger point injections to the right quadratus lumborum and right gluteus medius. (Tr. 865-66). At her physical therapy session that day, Ms. Charvat complained of continuous dull, aching tightness and throbbing discomfort in the back of the head occurring 90% of the time. (Tr. 928).

On May 11, 2021, Ms. Charvat attended a pain management follow-up appointment with Nicholas Mata, M.D., and reported the trigger point injections provided 30% relief for about a week. (Tr. 815). She endorsed daily migraines, continued trapezius and neck pain, and occasional swallowing difficulties that are not persistent or progressive. (*Id.*). Physical examination revealed tenderness to palpation of the cervical paraspinals and upper trapezius muscles with some pain in the right lesser occipital nerve distribution but was otherwise normal. (*Id.*). Ms. Charvat received Botox and trigger point injections in the office that day. (Tr. 817).

16

On May 27, 2021, Ms. Charvat returned to ASJWC and stated her latest Botox injection provided 70% improvement for about a week but that her symptoms had begun to worsen. (Tr. 867). She complained of tightness in the neck, daily migraines, aching hips, and occasional shooting pain down the lateral side of the leg to the calf. (*Id.*). On evaluation, PA Naftzger identified active trigger points in the upper trapezius, splenius cervicis, right paraspinal, gluteus medialis, and gluteus minimus. (*Id.*).

On June 7, 2021, Ms. Charvat met with PA Naftzger for more trigger point injections. (Tr. 869). PA Naftzger noted "small, abnormally sensitive areas in muscles that are confined to a limited space" on palpation. (*Id.*). She received injections into the left and right upper trapezius muscles.

On June 24, 2021, Ms. Charvat met with neurologist Dina Boutros, M.D., to discuss her chronic daily headaches and associated neck pain. (Tr. 764). She reported no improvement after the Chiari malformation decompression surgery and that she had tried and failed many medications, including Botox. (*Id.*). She described her headaches as starting in the occipital region and radiating to the frontal area, with nausea, photophobia, and phonophobia. (Tr. 764-65). She also loses peripheral vision and sees spots and colors in her eyes. (Tr. 765). Ms. Charvat also endorsed episodes of electric shock sensation associated with confusion. (*Id.*). Neurological evaluation was normal except she had horizontal nystagmus in the left eye. (Tr. 767). Dr. Boutros ordered brain and cervical spine MRIs and lab work, prescribed Nurtec ODT for migraines, and referred Ms. Charvat to a neurosurgeon for a consultation. (Tr. 770). The cervical spine MRI revealed a central disc extrusion at C5-C6 causing mild narrowing of the spinal canal and a paracentral protrusion at C6-C7 causing minimal narrowing of the spinal canal. (Tr. 737-38). The

17

brain MRI revealed nonspecific punctate foci of increased signal in the deep white matter but was otherwise normal. (Tr. 744-45).

Dr. Boutros referred Ms. Charvat to Paul Shin, M.D. for an opinion regarding her chronic neck pain. (*See* Tr. 784). Ms. Charvat met with Dr. Shin on August 9, 2021 and complained of neck pain in the bilateral posterior cervical region that radiates to the posterior occiput and down to the lower thoracic levels. (*Id.*). She indicated prior physical therapy and chiropractic treatment were not effective and her medications, baclofen and gabapentin, provide minimal relief. (*Id.*). On physical examination, Dr. Shin found tenderness mainly over a midline incision at C1-C3 and diffuse bilateral paracervical tenderness extending down to the upper thoracic region. (Tr. 786). Dr. Shin reviewed the cervical spine MRI and noted her disc displacement at C5-C6 but felt her pain was more consistent with myofascial pain and possibly related to scar tissue/entrapment neuropathy. (Tr. 787). Dr. Shin found "significant muscle wasting in the posterior muscle group at the level of prior surgery" and recommended physical therapy to focus on strengthening the extensor muscle group. (*Id.*).

On September 2, 2021, Ms. Charvat met with neurosurgeon Dane Donich, M.D., for a consultation regarding pain in her head and neck and to evaluate a pituitary lesion found in 2015. (Tr. 1003). Dr. Donich noted the pituitary lesion remained unchanged over several years and determined that surgery for it was not required; however, Dr. Donich ordered flexion and extension X-rays of the cervical spine to evaluate for instability since her decompression surgery. (Tr. 1006).

### III.   MEDICAL OPINIONS

On January 15, 2021, after reviewing Ms. Charvat's medical records, State agency medical consultant Mehr Siddiqui, M.D., did not perform a residual functional capacity (RFC) assessment but adopted the prior ALJ's RFC from May 2019, who determined Ms. Charvat has the capacity to perform light work except she can never climb ladders, ropes, or scaffolds; frequently climb ramps and stairs, balance, stoop, kneel, and crouch; occasionally crawl; and must avoid all exposure to hazards such as industrial machinery and unprotected heights. (Tr. 124). On January 22, 2021, after reviewing Ms. Charvat's psychiatric records, State agency psychological consultant Deryck Richardson, Ph.D., also adopted the prior ALJ's 2019 RFC, who determined Ms. Charvat has the residual functional capacity "to understand instructions, but the capacity to remember only simple instructions"; carry out simple and repetitive instructions and maintain an ordinary routine without special supervision in a setting without frequent changes, strict production quotas, or fast pace; relate to coworkers and supervisors adequately on a superficial basis in a work environment that does not involve working with the general public; and adapt to a setting in which duties are routine and predictable. (Tr. 125). Dr. Richardson also determined Ms. Charvat had moderate limitations in all four areas of mental functioning.[2] (Tr. 123).

In May 2021, State agency consultants Gary Hinzman, M.D., and Cynthia Waggoner, Psy.D., reviewed updated records and determined Ms. Charvat's RFC remained consistent with the prior ALJ's RFC. (Tr. 134-36).

---

[2]      The four areas of mental functioning—also known as the paragraph B criteria—represent the areas of mental functioning a person uses in a work setting. They are the abilities to (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. 20 CFR Part 404, Subpart P, Appendix 1, 12.00(A)(2)(b).

**IV.     OTHER RELEVANT EVIDENCE**

In January 2021, Ms. Charvat completed an Adult Function Report in which she described how her conditions limit her activities. (Tr. 258-65). She has frequent neck pain, migraines three to four times a week, and panic attacks several times a week. (Tr. 258). She rarely leaves her apartment, is fearful for no reason, and has poor energy and focus. (*Id.*).

When Ms. Charvat has a migraine, she cannot function and remains in bed. (Tr. 259). She does not get out of pajamas, shower, or do her hair and skips meals. (*Id.*). When she does not have a migraine, she is out of bed but still unable to do much because of her anxiety and panic attacks. (*Id.*). She enjoys reading, but cannot when she has a migraine and, due to medication side effects, finds it difficult to focus even when she is migraine-free. (Tr. 262). Before Ms. Charvat suffered from migraines and neck pain, she could work, be social, do yoga, run, paint, and sleep without issue. (Tr. 259, 262). She used to bake and prepare meals but now pain in her head and neck interferes with her ability to cook and follow recipes; she now makes frozen microwave meals. (Tr. 260). Ms. Charvat can do some household chores and laundry. (*Id.*). She drives infrequently due to panic attacks. (Tr. 261). She uses a grocery delivery service instead of going to the store. (*Id.*). Ms. Charvat does not go anywhere regularly attends all medical appointments virtually. (Tr. 262). She admits to being irritable with her mom when they speak on the phone. (*Id.*).

Ms. Charvat notes her conditions affect lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, seeing, memory, completing tasks, concentration, understanding, following instructions, using her hands, and getting along with others. (Tr. 263). Physical activity triggers neck pain, anxiety and panic attacks affect her interactions with others, and migraines affect her attention, concentration, vision, understanding, and memory. (*Id.*). Stress

increases her anxiety and pain while changes in routine make her feel overwhelmed. (Tr. 264). She experiences side effects from medications including fatigue and mental fog from Prozac, fatigue and cloudiness from cyclobenzaprine, and cloudiness from baclofen, diazepam, and alprazolam. (Tr. 265).

## V.    ADMINISTRATIVE HEARING

Ms. Charvat last worked at JPMorgan Chase & Co. until 2015 when she underwent a Chiari malformation decompression surgery. (Tr. 46). Before the surgery, Ms. Charvat endorsed weekly absences from work due to migraines. (Tr. 61). After the surgery, Ms. Charvat was in too much pain to keep working and described her migraines as "out of control." (Tr. 46).

She is unable to work now due to post-surgical pain from scarring, neck muscle atrophy, and seizing muscles that cause continued migraines that "feel[] like electric shocks." (Tr. 49). When Ms. Charvat has a migraine, she must lie down in a dark room. (*Id.*). She described her typical migraine as pain with lots of pressure that starts at the back of her neck and travels to her temples and face. (Tr. 62-63, 66). Her pain is aggravated by movement and light, and associated symptoms include nausea and some vomiting, vision issues, and grogginess. (Tr. 63, 65). Botox injections for migraines help Ms. Charvat feel "a little bit better," though she continues to have some pain and the helpful effects wear off after "a couple weeks." (Tr. 51). Her migraine medications, including gabapentin, Topamax, and baclofen, are helpful, but they make her tired and cause her to sleep all day. (Tr. 52, 63). Even when she does not have a migraine, Ms. Charvat has constant head pain that travels to her neck and shoulders. (Tr. 51). Lying down on a heating pad helps sometimes. (Tr. 52). Physical therapy did not alleviate her neck pain. (Tr. 60).

21

Her condition has worsened since the prior unfavorable disability determination in 2019.
(Tr. 50). In January 2020, Ms. Charvat started to feel "really bad" and cut down on socializing with
friends. (Tr. 55-56). She used to box but stopped in February 2020 due to head pain. (Tr. 55). In
September 2020, Ms. Charvat went to Hilton Head with friends for a vacation. (Tr. 56). She was
able to lie on the beach and walk by the water but also spent time lying down in the hotel. (Tr. 57).

Ms. Charvat spends most of the day lying down. (Tr. 53). When Ms. Charvat does not have
a migraine, she wakes up at 9:00 a.m. and eats a protein bar for breakfast. (Tr. 57). She reads and
naps on the couch before putting a frozen meal in the microwave for lunch. (*Id*.). When her
boyfriend gets home, they have dinner and watch television until bedtime. (*Id*.). On days when Ms.
Charvat has a migraine, typically three to four days a week, she does not get out of bed. (Tr. 58).
She sometimes goes to the gym to exercise but not when she has a migraine. (Tr. 63). Ms. Charvat
does not leave the house much because her migraines are triggered by "the light, the noise,
everything," and she is in constant pain all the time. (Tr. 50). Additionally, when Ms. Charvat
leaves her apartment she feels a sense of impending doom, gets very scared, and gets confused
about what she is doing and where she is going. (Tr. 54). Ms. Charvat drives, but not often and
only for short durations because she has panic attacks. (Tr. 43-44). Her father or her boyfriend
drive her to medical appointments that are further away. (Tr. 59).

Ms. Charvat can manage some household chores like wiping the counters, decluttering,
and putting things away, but cannot do any lifting or straining because it aggravates her neck pain.
(Tr. 59). Her boyfriend does the rest of the household chores. (*Id*.). Her mother comes over once
or twice a month to help with laundry, taking out the trash, mopping, and cleaning. (Tr. 59-60).

Ms. Charvat estimates she can stand for 20 minutes before sitting, sit for 10 to 20 minutes before standing, and can walk for a few minutes before needing to rest. (Tr. 52-53).

### THE ALJ'S DECISION

The ALJ's decision included the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through June 30, 2022. This finding adheres to that of the previous decision.

2.  The claimant has not engaged in substantial gainful activity since May 4, 2019, the alleged onset date (20 CFR 404.1571 *et seq.*). Except that this finding recites the alleged onset date for the present claim, it adheres to that of the previous decision.

3.  The claimant has the following severe impairments: Chiari I malformation, status-post remote [2015] decompression, degenerative disc disease of the cervical spine, degenerative disc disease of the lumbar spine/radiculopathy, metatarsal deformity, migraine headaches, anxiety, depression, post-traumatic stress disorder and central pain syndrome. (20 CFR 404.1520(c)). This finding departs from that of the previous decision, in order to account for the severe impairments documented in the current evidence.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526). This finding adheres to that of the previous decision.

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that the claimant may frequently balance, climb ramps and stairs, may occasionally stoop, kneel, crouch, crawl, but may never climb ladders, ropes or scaffolds; the claimant must avoid concentrated exposure to noisy environments, and all exposure to unprotected heights, dangerous moving machinery, and light brighter than that found in a typical office setting; the claimant is limited to the performance of simple tasks, conducted in a setting consisting of routine and predictable duties, with infrequent changes, which setting is free of fast-paced production demands or strict production quotas, which setting is non-public, and requires no more than superficial [defined as precluding customer service duties, and tasks involving confrontation, conflict resolution, collaboration,

23

directing the work of others, persuading others or bearing responsibility for the safety or welfare of others] interaction with co-workers and supervisors. This finding departs from that of the previous decision, in order to accommodate the present state of the impairments, as documented in the current evidence.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565). This finding adheres to that of the previous decision.

7.    The claimant was born on December 31, 1987 and was 31 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. (20 CFR 404.1563). This finding departs from that of the previous decision, in order to reflect the claimant's attainment of greater chronological age.

8.    The claimant has at least a high school education (20 CFR 404.1564). This finding adheres to that of the previous determination.

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2). This finding adheres to that of the previous decision.

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a). This finding adheres to that of the previous decision.

11.    The claimant has not been under a disability, as defined in the Social Security Act, from May 4, 2019, through the date of this decision (20 CFR 404.1520(g)). Except that this finding recites the alleged onset date for the present claim, it adheres to that of the previous decision.

(Tr. 17-29).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The Commissioner's

findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision is supported by substantial evidence, the Court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. Even if substantial evidence supports

the ALJ's decision, the court must overturn when an agency does not observe its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); accord *Shrader v. Astrue*, No. 11 13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

26

4.    What is claimant's residual functional capacity and can claimant perform past relevant work?

5.    Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION & ANALYSIS

Ms. Charvat takes issue with the ALJ's evaluation of her migraine headaches, claiming the ALJ erred by not considering whether her condition was medically equivalent to Listing 11.02 at Step Three, as directed Social Security Ruling (SSR) 19-4p. (Pl.'s Br., ECF #9, PageID 1049). She also claims the ALJ did not appropriately consider the effect her migraines have on her ability to sustain work when assessing her RFC; thus, she claims the RFC is not supported by substantial evidence. (*Id.* at PageID 1052).

The Commissioner concedes the ALJ did not expressly consider whether Ms. Charvat's headaches were medically equivalent to Listing 11.02, but argues her decision is supported by substantial evidence. (Comm'r's Br., ECF #11, PageID 1066). Moreover, the Commissioner claims Ms. Charvat did not meet her burden to show that her migraines equal the severity of Listing

27

11.02(B) because Ms. Charvat does not point to "any description from an acceptable medical source of a typical headache event," including the associated phenomena and limitations. (*Id.* at PageID 1067). The Commissioner also notes the ALJ's emphasis on the "numerous examinations throughout the record where Plaintiff has unremarkable results and no neurological deficits." (*Id.*).

> **A.    The ALJ erred in not evaluating whether Ms. Charvat's primary headache disorder medically equaled Listing 11.02.**

At Step Three, a claimant will be found disabled if her impairment meets or equals one of the listed impairments. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010). The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Commissioner considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). As such, a claimant who meets or equals the requirements of a listed impairment will be deemed conclusively disabled and entitled to benefits. *Id.* It is the claimant's burden to establish that claimed impairments meet or are medically equivalent to a listed impairment. *See, e.g., Lett v. Colvin*, No. 1:13 CV 2517, 2015 WL 853425, at *15 (N.D. Ohio Feb. 26, 2015). An ALJ will find that an impairment is "medically equivalent to a listed impairment ... if it is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a). The ALJ must consider all evidence in the case record about the impairment(s) and its effects on the claimant that is relevant to the finding of medical equivalence. 20 C.F.R. § 404.1526(c).

The Sixth Circuit does not require an ALJ to address every listing or discuss listings the claimant clearly does not meet, *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014), but the ALJ should analyze a relevant listing where the record "raise[s] a substantial

28

question as to whether [the claimant] could qualify as disabled." *Abbott v. Sullivan,* 905 F.2d 918, 925 (6th Cir. 1990). Where the ALJ's decision does not discuss a listing subsequently raised in objection, the court "must determine whether the record evidence raises a substantial question as to [the claimant's] ability to satisfy each requirement of the listing." *Smith-Johnson,* 579 F. App'x at 433. To raise a "substantial question," the claimant "must point to specific evidence that demonstrates [she] reasonably could meet every requirement of the listing.... Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three." *Id.* at 432-33. "If a substantial question is raised, then it cannot be harmless error since the claimant could have been found disabled." *Smith-Johnson,* 579 F. App'x at 433 n.5. However, reversal is not warranted when the ALJ's Step Three conclusion is sufficiently supported by factual findings elsewhere in the decision. *Forrest v. Comm'r of Soc. Sec.,* 591 F. App'x 359, 366 (6th Cir. 2014).

At the administrative hearing, Ms. Charvat's attorney directed the ALJ's attention to Social Security Ruling (SSR) 19-4p that provides guidance on the evaluation of primary headache disorders. (Tr. 42). She specifically requested the ALJ consider whether Ms. Charvat's migraine headaches medically equaled Listing 11.02 for epilepsy. (*Id.*). The ALJ did not do so and offered no explanation, either at the hearing or in her written decision, for why she did not consider Listing 11.02.

SSR 19-4p provides guidance on how primary headache disorders are established and evaluated. The Ruling indicates that "[p]rimary headache disorder is not a listed impairment," but Listing 11.02 (epilepsy) "is the most closely analogous listed impairment for a [medically determinable impairment] of a primary headache disorder." SSR 19-4p, 2019 WL 4169635, at *7. In developing SSR 19-4p, the Social Security Administration referred to the third edition of the

International Classification of Headache Disorders (ICHD-3), which provides classification of headache disorders and diagnostic criteria for scientific, educational, and clinical use. *Id.* at *2. The ICHD-3 diagnostic criteria for migraine without aura include pain lasting 4 to 72 hours (untreated or unsuccessfully treated) and at least two of four characteristics (unilateral location, pulsating quality, moderate or severe pain intensity, or aggravation by or causing avoidance of routine physical activity. *Id.* at *5. Additionally, during the headache, the individual must experience at least one of the following: nausea, vomiting, photophobia, or phonophobia. *Id.* Regarding Listing 11.02, SSR 19-4p explains, in relevant part:

> While uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and we may find that his or her [medically determinable impairment](s) medically equals the listing.
>
> Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from an [accepted medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

*Id.* at *7.

Here, the ALJ did not explicitly consider whether Ms. Charvat's migraine headaches medically equaled Listing 11.02. Elsewhere in the decision, the ALJ analyzed Ms. Charvat's impairments as follows:

The claimant's impairments of migraine headaches were identified as severe within the previous decision. While this finding would be supportive of the claimant's reports of migraines three or four times per week, or daily, the record, when considered as a whole, is not supportive of the contention that the existence of this impairment would be preclusive of all types of work.

During the early part of this claim, the claimant was receiving regular injections of "Botox" in treatment for this impairment. When regularly receiving this treatment, she described good relief, and the impairment was assessed as well controlled. This remained the case through May 2020, but there are no further Botox injections included in the evidence until May 11, 2021. Even so, her headaches were yet assessed as stable with this therapy. It is possible, of course, that additional injections were accomplished, but not documented in the evidence, except that an off-hand remark from a treatment provider, in March 2021, suggests a return to this form of therapy soon, given its efficacy in the past.

The claimant has reported prescriptions for medications intended to prevent migraines, as well as rescue medications, but she has been reported as non-compliant with dosing for preventatives, such as amitriptyline and Topiramate, and reports her use of the abortive medication Imitrex has been inconsistent, to say the least.

Into autumn of 2020, the claimant denied any progression of her headaches, and aside from her subjective reporting, the evidence has given no indication of such.

Diagnostic imaging of the claimant's brain, although reflective of white matter changes consistent with headaches or smell-vessel ischemic disease, has remained stable since September 2020.

Clinical examinations included in the record have consistently, albeit not universally, reported either mildly adverse, or benign findings, including one dated November 21, 2019, which reported cranial nerves II-XII as grossly intact and symmetric, or one dated June 4, 2021, which reported nystagmus of the left side of the left eye, but cranial nerves II-XII otherwise intact, with normal motor and sensory function, normal coordination and gait.

(Tr. 22) (citations omitted).

Though the ALJ considered Ms. Charvat's adherence to prescribed treatment, there is no

indication she considered any of the other criteria set forth in SSR 19-4p relevant to medical

equivalence with Listing 11.02(B). As Ms. Charvat pointed out (*see* ECF #9 at PageID 1045-47),

such relevant evidence is readily available in the medical record. A description of Ms. Charvat's headaches memorialized in the medical records indicates that her pain starts in the occipital region and radiates to the front of her head and sometimes into her face. (Tr. 765). It can last all day. (*Id.*). She has accompanying nausea and loss of peripheral vision, sees spots and colors in front of her eyes, and experiences photo- and phonophobia. (*Id.*). She cannot complete her activities of daily living once a headache takes hold. (Tr. 801). Any movement triggers severe pain and she must rest and close her eyes in a dark quiet room. (*Id.*). Throughout the relevant period, Ms. Charvat endorsed daily migraines lasting all day (Tr. 815), using Imitrex two to three times a week when she has a migraine (Tr. 382), and migraines occurring three to four times a week (Tr. 258).

Because the ALJ did not mention any of this relevant evidence, I cannot tell whether she considered it and discounted it or merely overlooked it. The failure of the ALJ to explain her disregard of this probative evidence leaves this Court without the ability to meaningfully review whether her conclusions are supported by substantial evidence. It bears repeating that the "substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks,* 531 F. App'x at 641 (cleaned up).

The ALJ's decision emphasized normal clinical findings, including intact cranial nerves, normal motor and sensory function, and normal coordination and gait, to conclude her migraines were not as severe as alleged. (Tr. 22). Even if the ALJ is factually correct on this point, as the applicable Ruling points out, the ALJ's focus should have been on records from the treating providers memorializing Ms. Charvat's statements regarding her migraine headaches, including the

32

duration, intensity, and accompanying symptoms; frequency, adherence to treatment; and limitations associated with the disorder or effect of its treatment. *See* SSR 19-4p, at *7; *see also Jandt v. Saul*, No. 1:20-CV-00045-HBB, 2021 WL 467200, at *10 (W.D. Ky. Feb. 9, 2021). The ALJ does not explain how the presence of these normal findings on physical examination is relevant to whether Ms. Charvat's migraine headaches medically equaled the severity and duration of 11.02(B).

Moreover, Ms. Charvat has identified a potential flaw in the ALJ's finding of nonadherence to prescribed treatment. Before concluding that a claimant's alleged medication non-compliance weighs against her allegations of disability, the ALJ must consider any reasons for such non-compliance. *See* 20 C.F.R. § 404.1530(c). Regarding Botox injections, the ALJ emphasized Ms. Charvat's description of "good relief" when regularly receiving injections, treating providers' notes that her headaches were "stable" with therapy and "well-controlled," and the year-long break from receiving Botox injections. The ALJ did not consider that when Ms. Charvat reported receiving "good relief" from the injections she explained she had fewer headache days. (Tr. 327). That her headaches remained "stable" or "well-controlled" during the time she was receiving Botox injections implies only that she had fewer headache days during the treatment, not that they ceased to exist. The evidence suggests Ms. Charvat reasonably could meet the frequency requirement of Listing 11.02(B) despite the reduction in headache frequency the injections afford her.

As it relates to amitriptyline, Ms. Charvat reported to Dr. Solymos that she stopped taking the medication because she does not need it for sleep. After the doctor explained to Ms. Charvat that amitriptyline "contributes to migraine prevention," there were no other indications of non-

compliance with this medication, suggesting Ms. Charvat's non-compliance was based on a mistaken belief that the medicine was prescribed to help her sleep. (Tr. 371).

Regarding topiramate, the ALJ cites Ms. Charvat's consultation with Dr. Shin, a treatment record that contains no reference to that medication. Elsewhere in the record, Ms. Charvat's treating providers declined to increase her topiramate dosage, which she noted helped with her headaches, due to her gastrointestinal side effects with confusion and paresthesia. (Tr. 318, 765).

Finally, in relation to Ms. Charvat's use of Imitrex, she expressly stated that she used the medication two to three times a week to abort a migraine, but that it stopped helping as much. (Tr. 382). The ALJ erred by failing to consider this information before concluding that noncompliance with treatment weighs against her allegations of disability. As such, I cannot conclude the ALJ's finding of noncompliance with medication is supported by substantial evidence.

The Commissioner claims Ms. Charvat cannot show medical equivalence to Listing 11.02(B) because she cannot show her migraines were equal to the severity of a dyscognitive seizure. (ECF #11 at PageID 1067) ("Dyscognitive seizures involve an alteration of consciousness. Thus, to be equivalent in severity to section 11.02 of the Listings, Plaintiff's headaches would have to result in an alteration of consciousness weekly. It can hardly be surprising that the ALJ did not find Plaintiff's headaches—which regularly resulted in no neurological or deficits in attention, concentration, memory, or thought process—as being of equivalent severity to a dyscognitive seizure."). I disagree.

First, an internal agency document used to process such claims suggests otherwise. In POMS DI 24505, the Social Security Administration provides examples of how medical

equivalence determinations are made, one of which considers medical equivalence related to chronic migraine headaches, as follows:

> A claimant has chronic migraine headaches for which she sees her treating doctor on a regular basis. Her symptoms include aura, alteration of awareness, and intense headache with throbbing and severe pain. She has nausea and photophobia and must lie down in a dark and quiet room for relief. Her headaches last anywhere from 4 to 72 hours and occur at least 2 times or more weekly. Due to all of her symptoms, she has difficulty performing her ADLs. The claimant takes medication as her doctor prescribes. The findings of the claimant's impairment are very similar to those of 11.02, Epilepsy, Dyscognitive seizures. Therefore, 11.02 is the most closely analogous listed impairment. Her findings are at least of equal medical significance as those of the most closely analogous listed impairment.

Social Security POMS DI 24505.015(B)(7)(b), Example 2. This illustrative example shows that an alteration in consciousness is not necessary to make a finding of medical equivalence.

In addition, the criteria an ALJ must specifically consider in determining the medical equivalence of a primary headache disorder does not include alteration of consciousness; rather, it instructs the ALJ to consider other limitations in functioning posed by a claimant's headaches, including interference with activity during the day, such as the need to lie down without moving or stay in a dark and quiet room. *See* SSR 19-4p, at *7.

Ms. Charvat has met her burden to show the record evidence raises a substantial question as to her ability to satisfy a listing. The evidence demonstrates that she could reasonably show her primary headache disorder is equal in severity and duration to the criteria in Listing 11.02(B), including headaches severe enough to require lying down in a dark room and avoiding movement that occur at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. Therefore, the ALJ's failure to consider whether Ms. Charvat's migraine headaches are medically equal to Listing 11.02(B) is not harmless.

**B.     The Court cannot determine whether the ALJ's RFC is supported by substantial evidence.**

Next, Ms. Charvat claims the ALJ did not sufficiently consider the effect of her migraine headaches on her ability to sustain work on a regular and continuing basis when assessing her RFC. (ECF #9 at PageID 1052). In addition to guiding the Step Three analysis, SSR 19-4p also explains how an ALJ must consider a primary headache disorder in assessing a claimant's RFC, as follows:

> If a person's primary headache disorder, alone or in combination with another impairment(s), does not medically equal a listing at step three of the sequential evaluation process, we assess the person's residual functional capacity. We must consider and discuss the limiting effects of all impairments and any related symptoms when assessing a person's RFC. The RFC is the most a person can do despite his or her limitation(s).

> We consider the extent to which the person's impairment-related symptoms are consistent with the evidence in the record. For example, symptoms of a primary headache disorder, such as photophobia, may cause a person to have difficulty sustaining attention and concentration. Consistency and supportability between reported symptoms and objective medical evidence is key in assessing the RFC.

SSR 19-4p at *7-8.

Here, Ms. Charvat made numerous statements to her treating providers, in her Adult Function Report, and at the administrative hearing about the limiting effects posed by her migraine headaches, including that she becomes nonfunctional and must lie down when struck by a migraine. *See* Sections II, IV, and V, above. Except to note that Ms. Charvat described migraine headaches occurring daily or three to four times a week and reported "good relief" with Botox injections (Tr. 21-22), the ALJ did not acknowledge any other statement Ms. Charvat made about the limiting effects of her headaches, much less evaluate the consistency and supportability of her symptoms with relevant evidence of record. As such, I cannot determine whether the ALJ's RFC is

supported by substantial evidence. Remand is required for the ALJ to adequately address all relevant evidence in the record.

CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **REVERSE** the Commissioner's decision denying disability insurance benefits and **REMAND** for additional proceedings consistent with this recommendation.

Dated: October 25, 2023

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge.** _See_ **Fed. R. Civ. P. 72(b)(2);** _see also_ **28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation.** _Berkshire v. Dahl_, **928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object."** _Howard v. Sec'y of Health and Hum. Servs._, **932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'"** _Overholt v. Green_, **No. 1:17-CV-00186,**

37

2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).